**DIGITAL EQUIPMENT CORPORATION,**
Plaintiff,

v.

**UNITED STATES, Defendant.**

No. 85–11–01584.

United States Court of International Trade.

Oct. 18, 1988.

Baker & McKenzie (William D. Outman, II and Thomas Peele, Washington, D.C., of counsel), for plaintiff.

John R. Bolton, Asst. Atty. Gen., Joseph I. Liebman, New York City, Atty. in Charge, International Trade Field Office (Saul Davis, Commercial Litigation Branch), for defendant.

Stephen S. Spraitzar, San Francisco, Cal., and George R. Tuttle, Washington, D.C., for amicus curiae Astec USA (HK) Ltd.

## MEMORANDUM OPINION

WATSON, Judge:

This case places in issue the tariff classification of merchandise which can be generally described as power supplies for computers. The Customs Service classified this merchandise as "rectifiers and rectifying apparatus" under Item 682.60 of the Tariff Schedules of the United States ("TSUS"). The plaintiff claims that these articles are properly classifiable under a provision which recognizes their use as parts of computers, namely, as "parts of automatic data-processing machines and units thereof" under Item 676.52 (now Item 676.54), TSUS. The resolution of this issue depends on a detailed understanding of the nature and function of the imported merchandise, which for the purpose of this action has been stipulated to be represented by the DEC Model H 7862–C Computer Power Supply. As a result of hearing the expert testimony offered at trial and studying the exhibits, and applying the relevant law to the facts determined, the Court comes to the conclusion that the classification assigned by the government to this merchandise does not adequately describe it by name or function. This conclusion can be best explained by proceeding through the detailed description of the merchandise at issue and relating its operation to that of the computer of which it is a part.

The functions of the imported article can be divided into eight or nine categories. The first is transformation, which in this case involves the conversion of the higher voltage supplied from the outside to a lower voltage. The next function is rectification in its dictionary sense, which is the conversion of alternating current (AC) to direct current (DC). The third function is that of achieving electro-magnetic compatibility. This is the function of controlling the electrical noise generated by the power supply or by the rest of the computer, which, if not controlled, can interfere with the operation of the computer or with the operation of nearby electronic equipment. This function has nothing to do with rectification. The fourth function is the control of the original AC power. This includes an on-off switch and devices for controlling an overload of current. It may also include an input voltage selection switch, for choosing

between 110 or 220 AC input voltage. The on-off switch may be considered as incidental to the rectification function, but the protection against overload is an important independent function designed to protect the computer. The fifth function is energy storage, in which capacitors are used to hold sufficient power to ensure the orderly shutdown of the computer in the event of malfunction. The power is stored, not for immediate power supply needs as an adjunct to rectification, but for the essential needs of the computer in the event of a power disruption. In that case the stored energy will be used to save the information stored in the computer memory. The sixth function is that of protection above and beyond that against an overload of the original AC power. This includes protection against excessive voltage, insufficient current and excessive temperature. The seventh function is that of providing for a monitor/computer interface. This establishes communication with the computer so that if a malfunction occurs on the power side it can direct the computer to stop operations and store data, or if a malfunction occurs within the computer, it can direct a shutdown of the power supply. This goes well beyond rectification. The eighth function is DC to DC power conversion which, in effect, is an additional control of the DC power to the precise tolerances required by modern computers. This is entirely apart from rectification. The ninth device is simply a fan which cools the entire computer system, including the power supply.

In the opinion of the Court the imported merchandise whose functional aspects are summarized above is not encompassed by even the most generous interpretation of the tariff provision for rectifiers and rectifying apparatus. In the opinion of the Court, the classified provision could conceivably describe within the ambit of rectifying apparatus a device which had certain features which were supportive of and subordinate to a rectifier, let us say, transformation and rudimentary control and protection in aid of rectification. But this article contains elements which have an importance of their own vis-a-vis a computer, and

a role which it would be unreasonable to treat as merely incidental or ancillary to rectification.

It appears to the Court that under the eminently sound reasoning of *Fedtro, Inc. v. United States*, 72 Cust.Ct. 267, 376 F.Supp. 1398, CD 4548 (1974), even *one* important function other than those supporting rectification would be sufficient to indicate the inadequacy of the classification. In that action, the Court found that the battery *testing* feature of the importation was highly significant and was not merely incidental or auxiliary to the battery *charging* portion of the importation and therefore the government's classification of the article as "rectifying apparatus" was incorrect. Here we have an abundance of important additional functions which it would be unreasonable to categorize as secondary or incidental.

The government argues that the naming of "rectifying apparatus" in addition to rectifiers means that coverage of more complex devices was intended. The government traces the TSUS provision back to its origin in Heading 85.01 of the 1955 edition of the Brussels Nomenclature and argues that the intention of the Brussels Nomenclature was to include all forms of devices which were the power supplies of machines, if they were not imported as entireties.

The Court finds it inappropriate to derive so expansive an intent from the use of the 1955 Brussels Nomenclature. The record establishes that those devices which could be generally called power supplies for computers at that time have undergone enormous changes which make the original description in a provision for rectifiers completely inadequate. In fact, the Court is of the opinion that, for purposes of confirming the inadequacy of the term "rectifying apparatus" it is permissible to note that the 1972 edition of the Brussels Nomenclature shows power supplies for computers classifiable as parts of computers under Heading 84.53. The important additional functions performed by these devices, which functions were developed only in the 1960's and 1970's convince the Court that the provi-

sion for rectification apparatus, does not adequately or accurately describe these importations. In the opinion of the Court this is a case in which "the integrity of the Tariff Schedules will be far greater preserved if artificial classifications are not rationalized under antiquated schedules neither designed nor intended for present day application." *Texas Instruments, Inc. v. United States*, 82 Cust.Ct. 272, 475 F.Supp. 1183, 1192 (1979); *aff'd* 67 C.C. P.A. 59, 620 F.2d 269 (1980).

The expansive scope sought by the government for the term "rectifying apparatus" is also not supported by authoritative reference works such as the *IEEE Standard Dictionary of Electrical And Electronic Terms* (2nd Ed.1978) or Van Nostrand's *Scientific Encyclopedia* (6th Ed.1983).

Finally, the Court finds that the record as a whole, including persuasive testimony as to the design and use of these importations supports the conclusion that these importations are parts of computers properly classifiable under Item 676.52 TSUS as parts of data-processing machines. *See generally, Data Products Corp. v. United States*, 4 CIT 234, 558 F.Supp. 124 (1982).